UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**TAMMY JACOBS,**

     Plaintiff,

  -vs-                                                     Case No. 13-C-608

**WINKY FOOD PRODUCTS, LLC,
(FICTIONAL NAME),
LAKEVIEW FARMS, LLC
(COMPANY NAME),**

     Defendant.

---

## DECISION AND ORDER

---

Tammy Jacobs claims that the defendant, Lakeview Farms, LLC, fired her because of the distraction caused by her terminally ill father in violation of the associational discrimination provision of the Americans with Disabilities Act, 42 U.S.C. § 12112(b)(4). Lakeview Farms moves for summary judgment. For the reasons that follow, this motion is granted.

### BACKGROUND

Lakeview Farms, LLC is a national food processing company with its headquarters in Delphos, Ohio. Lakeview produces dips and desserts in many flavors, shapes and sizes for sale in supermarkets, convenience stores, food service, and warehouse clubs around the country. Lakeview operates a manufacturing plant in Delphos, Ohio; a manufacturing plant in Bristol, Wisconsin; and a sales office in

Woodland Hills, California.

Jacobs was initially placed at the Bristol plant as a temporary employee through Kelly Services in late November, 2010. On January 3, 2011, Jacobs was hired full-time as Assistant Research and Development Manager. Her starting rate of pay was a salary of $1,384.62 per week.[1] As Assistant Research and Development Manager, Jacobs' job duties and responsibilities included: applied research; development of new products; testing ingredients from alternate suppliers; developing processes on the floor; label developments; and specification writing.

On February 27, 2012, Jacobs was promoted to Quality Assurance Manager and received an increase in salary pay to $1,538.47 per week. In this position, Jacobs' responsibilities included setting all quality guidelines for the manufacturing facility; assisting the Research and Design Department in setting manufacturing guidelines; scheduling and directing all Quality Assurance personnel to provide adequate support to ensure all products are manufactured following manufacturing and quality guidelines; reviewing all in-process and finished product tests to ensure all products meet specifications; and preparing and retaining documentation for all of the above.

Lakeview previously operated a manufacturing plant in southern California, but closed it in late March 2012, at which time production of products previously made in

---

[1] Inexplicably, Jacobs objected to this (and many other) proposed findings of fact by asserting that Lakeview's citation to the record did not support the factual statement. In each and every instance where Jacobs lodged this objection (the Court will not catalog them all), the cited evidence *did* support the proposed finding of fact. *See, e.g.,* Lakeview's Proposed Finding of Fact, ¶ 8 ("Tammy Jacobs' starting pay rate for her position as Assistant Research and Development Manager was a salary of $1,384.62 per week"), citing Ernest Graves Aff. ¶ 5, which states exactly the same thing. As an apparent effort to create confusion in the record where there was none, this was a perplexing and ultimately pointless strategy.

California was dispersed to Lakeview's other plants. On May 25, 2012, Lakeview President and CEO Ernest "Gene" Graves decided to pay a bonus to salaried staff at the Bristol facility in recognition of the long days and seven day a week schedule that they had put in during the period of January to April 2012 as a result of the plant consolidation from California to Bristol. Jacobs received a bonus of $2,500.00, the lowest of those employees receiving the bonus.

One of the products whose production was shifted from California to Bristol was Senor Rico Vanilla gelatin. Jacobs was responsible for ensuring the quality of this product. Lakeview received repeated customer complaints and market reports of spoilage and shelf life expectation failures of this product after the transition to Bristol. Graves received reports from Lakeview personnel in Commerce, California as early as June, 2012 that Senor Rico Vanilla gelatin was watery, separating, and pulling away from the cup before its expiration date. There were also contamination issues involving high micro-bacteria counts. The formulators in Bristol were not following proper procedures for this product. The Quality Assurance team failed to catch and correct deficiencies in the production of Senor Rico Vanilla gelatin before the product was shipped to customers. If contamination and product deficiencies are not discovered before distribution, problems are noticed after the product has been put on shelves in the market for consumer purchase.

After the quality problems with Senor Rico Vanilla gelatin were realized in June 2012, Graves wanted to terminate Jacobs' employment immediately. Pat Denor, Jacobs' immediate supervisor, persuaded Graves to give Jacobs another chance due to the press of

business at that time. The problems with Senor Rico Vanilla gelatin cost Lakeview a significant amount of money as a result of lost production labor, lost product and disposal charges for the bad product. Lakeview was forced to destroy 4095 cases of product with a value of $25,348.00 at wholesale price. Lakeview incurred additional financial losses from issuing credits to customers for defective product in the marketplace.

Another product that was shifted to Bristol was Senor Rico Cajeta, a caramel rice pudding. Lakeview received customer complaints and market reports of spoilage and shelf life issues with this product in the summer and fall of 2012. Graves received reports from Lakeview personnel in Commerce, California as early as June, 2012 that Senor Rico Cajeta appeared runny on customers' shelves before its expiration date. These issues were caused by micro-bacteria contamination.

Lakeview initially suspected that the caramel purchased from an outside vendor and added to the Senor Rico Cajeta product was contaminated. When Lakeview personnel tried to match the lot code dates stamped on individual product packages with the batches of caramel used in the Senor Rico Cajeta product, they discovered that the lot codes on the product packages in the market were not recorded on the corresponding production documents back at the Bristol plant. As Quality Assurance Manager, Jacobs was responsible for ensuring that product lot codes were recorded properly.

After further investigation, Lakeview determined that the caramel in the Senor Rico Cajeta product was contaminated by its own equipment because the production equipment used to fill caramel into the product cups was not being disassembled and cleaned properly. Lakeview was also unable to locate and track "ATP" test swabs that

should have been taken to verify that the caramel-filling equipment was sanitary. The failure to ensure that the equipment was cleaned and sanitized properly and the absence of ATP data were shortcomings for which Jacobs was ultimately responsible.

Lakeview was forced to destroy 574 cases of the Senor Rico Cajeta product with a value of $4,700.00 at wholesale price. Lakeview also lost money through the issuance of credits to customers for defective products. Once again, Lakeview lost credibility with its customers as it was attempting to consolidate production.

In the summer and fall of 2012, Lakeview was preparing for an important plant-wide audit of the operation of the Bristol plant by Kraft, a major food manufacturer and distributor and prospective Lakeview customer. As the Quality Assurance Manager, Jacobs worked closely with the quality representative from Kraft, and Jacobs had significant responsibilities with respect to the audit. If the Kraft audit was successful, Lakeview would become a Kraft-certified plant and would be able to produce certain cheese products for Kraft. Kraft's quality standards were higher than previous audits in which Jacobs was involved. The Kraft audit was delayed to November 2012 at least in part due to Jacobs' lack of progress on it.

In or around August 2012, Jacobs' father was diagnosed with pancreatic cancer. During the same period, Jacobs' mother was also dealing with cancer and other health issues such as cognitive deficit. Late that month, Jacobs informed Denor that her father had pancreatic cancer that was likely terminal. Jacobs spoke to Denor about needing to take time off to assist with her father's care. Jacobs asked Denor whether she would need to apply for FMLA or document the time she missed. Denor responded that FMLA was

not necessary and that Jacobs should take the time she needs. When Jacobs needed to take time off to care for her father, she would tell Denor. Jacobs began missing time from work in August 2012, continuing through September and into October. Lakeview paid Jacobs her normal salary during this time period.

In August 2012, Jacobs was moved to the Research and Development Department to become Research and Development Manager. This was considered a lateral move within the company. Steve Zelten was hired to replace Jacobs as Quality Assurance Manager on September 16.

On October 17, 2012, Denor approached Jacobs in the plant and told her that Graves wanted to talk to her. Graves met Jacobs in a conference room at the Bristol plant and told her that her employment was terminated, effective immediately. Graves decided to terminate Jacobs because the quality department for which she was responsible was not performing at an acceptable level, which had a very negative effect upon Lakeview Farms' business. Graves handed Jacobs an envelope containing a severance package, which Jacobs refused to accept. Art Koharski, a production associate, was also terminated in connection with the Senor Rico caramel and vanilla problems. Zelten, Jacobs' replacement as the Quality Assurance Manager, was terminated on March 27, 2013 for failure to meet performance expectations and conflicts with his staff.

Following Jacobs' termination, and during the Kraft audit, it was discovered that Lakeview was unable to trace certain ingredients into the finished product. Documentation to trace ingredients into finished products is required by law and is essential to the ability to conduct a product recall if that should become necessary.

Lakeview's inability to trace ingredients into certain products was caused by Jacobs' failure to ensure that proper records were maintained before her termination, and the failure of her Quality Assurance team to identify and work with production management to correct deficiencies during daily reviews of the production records.

**ANALYSIS**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Material" means that the factual dispute must be outcome-determinative under law. *Contreras v. City of Chi.*, 119 F.3d 1286, 1291 (7th Cir. 1997). A "genuine" issue must contain specific and sufficient evidence that, were a jury to believe it, would support a verdict in the non-moving party's favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of showing that there are no facts to support the nonmoving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether summary judgment is proper, a court must construe the evidence in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. There is no genuine issue of material fact, and therefore no reason to go to trial, when no reasonable jury could find in the non-moving party's favor. *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012).

The ADA prohibits an employer from discriminating against an employee because of "the known disability of an individual with whom [the employee] is known to have a

relationship or association." § 12112(b)(4). This is a fairly rare type of claim that the Seventh Circuit has struggled to adapt to the traditional *McDonnell Douglas* burden-shifting framework. *See Dewitt v. Proctor Hospital*, 517 F.3d 944, 948 (7th Cir. 2008) ("The *McDonnell Douglas* test is not easily adaptable to claims under the section of the ADA that permits causes of action for association discrimination. It's a bit like a mean stepsister trying to push her big foot into one of Cinderella's tiny glass slippers") (Evans, J.). Nonetheless, the Seventh Circuit has endorsed a "modified *McDonnell Douglas* for claims under this section of the ADA, stating that a plaintiff can prove her case by establishing: (1) she was qualified for the job at the time of the adverse employment action; (2) she was subjected to an adverse employment action; she was known by her employer at the time to have a relative or association with a disability; and (4) her case falls into one of the three relevant categories of expense, distraction, or association." *Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 336-37 (7th Cir. 2012) (citing *Larimer v. Int'l Bus. Mach. Corp.*, 370 F.3d 698, 701-02 (7th Cir. 2004)). This "modified *McDonnell Douglas* test and the direct method can often be analyzed together because '[b]oth approaches require the plaintiff to present evidence indicating it is more likely than not the employer took the adverse action because of the plaintiff's disability, . . . – or as more accurately stated for this case, because of the plaintiff's association with a disabled individual." *Magnus* at 337 (internal citations omitted). In other words, Jacobs must demonstrate that her termination "occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision." *Dewitt*, 517 F.3d at 952 (Posner, J., concurring).

- 8 -

Jacobs argues that her situation falls into the "distraction" category. Such a scenario arises when an employee is fired because she "is somewhat inattentive at work because [her] spouse or child has a disability that requires [her] attention, yet not so inattentive that to perform to [her] employer's satisfaction [s]he would need an accommodation, perhaps by being allowed to work shorter hours. The qualification concerning the need for an accommodation (that is, special consideration) is critical because the right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate of a disabled person." *Larimer*, 370 F.3d at 700 (citing 29 C.F.R. § 1630.08; *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1083-85 (10th Cir. 1997); *Tyndall v. Nat'l Education Centers, Inc.*, 31 F.3d 209, 214 (4th Cir. 1994)). Relevant to distraction, an employer "cannot terminate the employee for unfounded assumptions about the need to care for a disabled person." *Magnus* at 337. The legislative history explains:

> [A]ssume, for example that an applicant applies for a job and discloses to the employer that his or her spouse has a disability. The employer believes the applicant is qualified for the job. The employer, however, assuming without foundation that the applicant will have to miss work or frequently leave work early or both, in order to care for his or her spouse, declines to hire the individual for such reasons. Such a refusal is prohibited by this subparagraph.
>
> In contrast, assume that the employer hires the applicant. If he or she violates a neutral employer policy concerning attendance or tardiness, he or she may be dismissed even if the reason for the absence or tardiness is to care for the spouse. The employer need not provide any accommodation to the nondisabled employee.

*Magnus* at 337 (citing H.R.Rep. No. 101-485, at 61-62).

Jacobs relies primarily upon the timing of her termination, coming approximately

two months after Lakeview learned about her father's illness. Temporal proximity "can serve as an important evidentiary ally of the plaintiff," but it "rarely alone is sufficient to create a triable issue on causation, . . ." *Magnus* at 338. To the contrary, Lakeview exhibited zero concern about the illness from a workplace perspective, telling Jacobs to take time off as needed – paid time, not even unpaid FMLA leave. *See, e.g., Cavender v. Sunbelt Rentals, Inc.*, No. 1:06-cv-664-JDT-WTL, 2007 WL 3119693, at *12 (S.D. Ind. Oct. 22, 2007) (rejecting distraction claim because the employer was "quite tolerant to the extent Cavender may have been 'distracted'") (Tinder, J.). Lakeview was concerned about the quality of Jacobs' work, not the amount of work she was doing or when she was doing it. This concern arose prior to her father's diagnosis. Jacobs was on the verge of being fired in June of 2012 before Denor talked Graves into giving Jacobs another chance.

Jacobs essentially disputes the stated reasons for her firing – that she botched the transition from California to Bristol with respect to two key products, and also that she was slow to prepare for the Kraft audit – by disavowing ultimate responsibility for these issues. According to Jacobs, she was an excellent employee who never received any counseling or warnings that her job was in jeopardy. Jacobs' perception of her own job performance and responsibilities is not relevant, certainly not to the extent that her termination could be considered unwise or unfair. "A pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit use to cover one's tracks." *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002). It cannot be considered unreasonable for Graves to hold the quality

assurance manager responsible for failing to assure product quality.  Reasonableness aside, Jacobs produced no evidence that Graves "fabricated [his] reason[s] for terminating her." *Cianci v. Pettibone Corp.*, 152 F.3d 723, 727 (7th Cir. 1998).  Jacobs argues that the bonus she received demonstrates that she was, in fact, a terrific employee.  Not so here because the bonus was "across-the-board," not merit-based.  *Magnus* at 339.

Jacobs argues that her purported excellent employment record, combined with the timing of her termination, is enough to survive summary judgment, citing *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1021 (8th Cir. 2005) (reversing summary judgment on claim for association with Down's Syndrome child). *Strate* is distinguishable for a variety of reasons, primarily because *Strate* is an expense case, not a distraction case.  Unlike the plaintiff in *Strate*, Jacobs offers no coherent reason as to why Lakeview would fire her because of her father's illness.  Obviously, Jacobs cannot argue expense because her father would not be covered by Lakeview's health plan.  *Larimer* at 700 (explaining that an association case falls under the "expense" category when an employee is fired because "his spouse has a disability that is costly to the employer because the spouse is covered by the company's health plan").  Jacobs argues instead that Lakeview assumed without foundation that she would have to miss work or frequently leave work early to care for her father.  Jacobs presents no evidence, direct or circumstantial, that she was fired for this reason.  As noted, the evidence suggests just the opposite. Jacobs *did* miss work because of her father's illness, and Lakeview didn't even fire her for this reason (although it could have).  Instead, Lakeview fired Jacobs because she was a poor employee whose mistakes cost the company thousands of dollars.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT** Lakeview's motion for summary judgment [ECF No. 14] is **GRANTED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 29th day of August, 2014.

**BY THE COURT:**

*[signature: Rudolph T. Randa]*

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**